UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>**TROVERCO, INC.,**<br><br><br>**Debtor.** | **Chapter 11**<br>**Case No. 17-44474**<br><br>**Hearing Date and Time:**<br>July 5, 2017, 10:30 a.m.<br>(Prevailing Central Time)<br><br>**Hearing Location:**<br>Courtroom 7 South |

## DECLARATION OF JOSEPH E. TROVER, JR. IN SUPPORT OF THE DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS

Joseph E. Trover Jr., pursuant to 28 U.S.C. § 1746, declares as follows:

1. I am the Chief Executive officer of Troverco, Inc., the above-captioned debtor and debtor-in-possession ("Troverco" or the "Debtor").

2. I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtor's employees, professionals, or retained advisers that report to me in the ordinary course of my responsibilities. References to the Bankruptcy Code (as defined below), the chapter 11 process and related legal matters are based on my understanding of such matters as explained to me by the Debtor's professionals. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

3. I submit this Declaration on behalf of the Debtor in support of the Debtor's voluntary petition for relief under chapter 11 of the Bankruptcy Code and "first day" motions, which are being filed contemporaneously with the voluntary petition (collectively, the "First Day Motions"). The Debtor seeks the relief set forth in the First Day Motions in order to minimize the impact of the commencement of these chapter 11 cases on their business as well as to ensure

a smooth transition into chapter 11 for the Debtor's employees, customers, and vendors and suppliers. I have reviewed the Debtor's petition and the First Day Motions, or have otherwise had their contents explained to me, and it is my conclusion that the relief sought in each First Day Motion is essential to ensure the uninterrupted operation of the Debtors' businesses and the success of these chapter 11 cases.

4. On June 29, 2017 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Missouri (the "Bankruptcy Court"). The Debtor will continue to operate its business as a debtor-in-possession.

## THE DEBTOR'S BUSINESS AND
## EVENTS LEADING TO THE CHAPTER 11 CASE

**A.** **Business Overview**

5. The Debtor is one of the largest direct store delivery ("DSD") distributors of packaged fresh and frozen consumer goods including deli sandwiches, subs, salads, parfaits, drinks, burritos, chicken sandwiches, hamburgers, hot dogs, sausages, snack trays and vegetable trays. The Debtor's customers include gas stations, convenience stores and similar outlets in eighteen (18) states.

6. The Debtor began as a franchise in 1959 under the name Lakeshire Sandwiches (which was subsequently changed to Landshire, Inc.). The Debtor specializes in freshly-prepared sandwich delivery to businesses wanting to serve tasty food without the overhead that a kitchen and a cook would entail. In 1966, while a driver for Troverco, my father, Joseph "Jody" Trover, purchased the East St. Louis, Illinois operation. That year, my father instituted a new program providing affordable lunches for students. In a four year time span, my father converted

a modest two route operation into a viable business through hard work, perseverance, quality, service, and innovation.

7. Prior to recent changes, Troverco operated a network of 56 distribution centers (distribution centers, depots and pods) in the Midwest and Southeast United States. This network consisted of 113 weekly routes to nearly 6,700 customers per week, with over 350,000 stops annually. Troverco currently distributes approximately 180 stock-keeping units, or SKUs, of packaged fresh and frozen consumer goods including deli sandwiches, subs, salads, parfaits, drinks, burritos, chicken sandwiches, hamburgers, hot dogs, sausages, snack trays and veggies trays to customers.

8. Troverco services a variety of store formats, including traditional chain convenience stores, independently owned convenience stores, gas station stores and other stores that carry convenience products. In addition to convenience stores, Troverco distributes to a smaller amount of military stores, drug stores, hospitals, prisons and other customers within its network. Some of the Debtor's largest customers included Circle K stores, the Army and Air Force Exchange System Network, CVS Pharmacy, Casey's General Stores, Timewise and Trucker's America.

9. Manufacturers rely on Troverco's ability to effectively and efficiently distribute their products because they do not have the distribution capability to effectively sell and deliver their products to thousands of customers in discrete retail locations. In addition, many convenience stores either do not have their own distribution network or their distribution network is not equipped to handle products that need refrigeration, creating the need for a DSD provider focused on fresh and refrigerated products. Troverco customers benefit from the distribution network because they gain access to products they would otherwise not be able to

access due to their small order sizes and diverse, remote locations and need for refrigeration. Without the Debtor's services, customers would be unable to carry as wide a breadth of inventory.

10. Troverco derives revenues from the sale of products to convenience store retailers. The products are delivered to customers using delivery vehicles running a route based network from the Debtor's distribution centers. Gross profit is generated by applying a markup to the cost of the product at the time of the sale. The Debtor's operating expenses are comprised primarily of sales personnel costs; warehouse personnel costs related to receiving, stocking, and selecting product for delivery; delivery costs such as delivery personnel, truck leases and fuel; and costs relating to the rental and maintenance of distribution centers and other general and administrative costs.

**B.     AdvancePierre Transaction**

11. Prior to 2015, Troverco was an integrated manufacturer and distributor. The Debtor manufactured Landshire branded sandwiches that it delivered through its DSD network. In 2014, the Trover family made a strategic decision to sell a portion of the business. The Trover family believed that the Landshire manufacturing operation had reached a point in its development requiring different management skills and consequently would benefit from an owner with greater financial resources, marketing expertise and a broader strategy for the sandwich and "grab and go" food categories. In addition, the shareholders believed their expertise was in managing the distribution business and they looked forward to returning to the full-time management of the DSD operation. In January, 2015, the Debtor sold the Landshire manufacturing operation, including all of Landshire's production assets, sales resources, customer relationships, and all trade names and intellectual property associated with the

sandwich-making operations to AdvancePierre Foods, Inc. ("AdvancePierre"). The DSD operation was renamed Troverco, Inc.

12. In connection with the AdvancePierre transaction, Troverco entered into two separate agreements with AdvancePierre under which Troverco agreed to continue purchasing the products it had previously manufactured from AdvancePierre at a set price – a supply agreement (the "Supply Agreement") and an earn-out agreement (the "Earn-out Agreement").

13. The initial term of the Supply Agreement extends for three years from execution, expiring on January 30, 2018. The salient terms of the Supply Agreement include:

- The right for Troverco to distribute Landshire branded products anywhere without any restrictions.

- The right of first refusal for AdvancePierre to supply any adjacent category products Troverco wishes to sell but is not currently selling so long as AdvancePierre's pricing is within 110% of the competitor from which Troverco wishes to purchase.

- an agreement by AdvancePierre that it will not to compete directly in the DSD business or grant any other DSD provider exclusive rights to any territory in which Troverco currently distributes.

- A fixed price for the purchase of each of the 88 Landshire branded SKUs and a pricing mechanism to adjust the pricing in the event of cost increases to AdvancePierre.

14. During the first year and first two semi-annual periods, Troverco met the minimum purchase requirements under the Earn-out Agreement and received the payments to which it was entitled. Troverco will not satisfy the minimum purchase requirements for the six-month period between January and July 2017, and therefore, it will not receive the earn-out payment for this period.

C. **Prepetition Indebtedness, Capital Structure and Financial Performance**

15. The equity of the Debtor is owned by non-debtor Troverco Holding Company.

16. As of the Petition Date, the Debtor had no secured debt.

17. For the fiscal year ended December 31, 2016, the Debtor experienced net operating losses of approximately $8.3 million on net revenue totaling approximately $47 million. As of December 31, 2016, the book value of the Debtor's assets is approximately $5 million and its liabilities total approximately $10 million.[1] The Debtor's unsecured trade debt (obligations to suppliers and vendors other than lessors) totals approximately $2.2 million.

D.  **Events Leading To Commencement of the Chapter 11 Case**

18. In 2014, the Trover family made a strategic decision to sell the manufacturing operation to AdvancePierre, as discussed above. The Trover family believed that the Landshire manufacturing operation had reached a point in its development requiring different management skills and consequently would benefit from an owner with greater financial resources, marketing expertise and a broader strategy for the sandwich and "grab and go" food categories. In addition, the shareholders believed their expertise was in the DSD business. When the Debtor agreed to sell the manufacturing operation to AdvancePierre, it modeled that the distribution business would lose money, but that those losses would be partially offset by the earn-out payments.

19. Thereafter, the Debtor made a strategic decision to focus the DSD operations on a fresh program in an effort to offer more products to increasingly health-conscious consumers. The distribution of fresh products (including salads, wraps, yogurts, cheeses, hard boiled eggs, fruit and parfaits) requires operational expertise as the products have a very short shelf life once they are produced. The Debtor's fresh program required a significant infrastructure investment

---

[1] Nothing herein constitutes an admission or acknowledgment that any claims described and identified herein are valid, enforceable, allowable, or not subject to disputes, counterclaims, or offsets. The Debtor continues to review its books and records and reconcile its liabilities.

6

in three new distribution centers. However, the fresh program did not result in profits for the Debtor.

20. In 2016, the Debtor undertook a number of efforts focused on increasing route density, increasing revenue per stop and reducing cost and complexity within the Debtor's operations. Most recently, the Debtor has taken steps to reduce its workforce and operational costs. Despite these and other efforts, the Debtor was unable to halt losses or overcome its liquidity constraints.

21. Accordingly, the Debtor took the unfortunate but necessary step of filing this chapter 11 case to protect, preserve and maximize the value of its business and assets. Through this chapter 11 case, the Debtor intends to restructure its obligations under a plan of reorganization that promotes the Debtor's business plan and complies with the applicable provisions of the Bankruptcy Code.

## FIRST DAY MOTIONS

22. To minimize the adverse effects of the commencement of the chapter 11 case on its business and employees, the Debtor has requested various types of relief in its First Day Motions, all of which were filed shortly after the Petition Date. I believe that the relief requested in each of the First Day Motions is necessary and appropriate, constitutes a critical element in achieving a successful and smooth transition to chapter 11 and is in the best interest of the Debtors' estates, creditors, and other parties in interest.

23. The First Day Motions are:

    (a) Debtor's Motion for Entry of an Order (I) Authorizing, But Not Directing, the Debtor to Pay Certain Prepetition Wages, Compensation, and Employee Benefits and Continue Payment of Wages, Compensation and Employee Benefits in the Ordinary Course of Business and (II) Authorizing Applicable Banks and Other Financial Institutions to Process and Pay All Checks Presented For Payment and to Honor All Funds Transfer Requests Made By the Debtor Related Thereto

  (b) Debtor's Motion for Entry of an Order Authorizing Continued Use of the Debtor's Existing Cash Management System, Bank Accounts, and Business Forms

  (c) Debtor's Motion for Entry of an Order (I) Authorizing, But Not Directing, the Debtor to Continue Prepetition Insurance Coverage and (II) Authorizing and Directing Financial Institutions to Honor Related Checks and Transfers

  (d) Debtor's Motion for Entry of an Order (I) Authorizing Payment of Certain Prepetition Taxes and Fees and (II) Authorizing Financial Institutions to Process and Cash Related Checks and Transfers

  (e) Debtor's Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Discontinuing, Altering or Refusing Service on Account of Prepetition Invoices, (II) Deeming Utility Providers to Have Adequate Assurance of Future Payment, and (III) Establishing Procedures for Resolving Requests for Additional Assurance

  (f) Debtor's Motion for Entry of an Order Extending the Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statement of Financial Affairs

24. For a detailed description of the First Day Motions, the Debtor respectfully refers the Court and parties in interest to the respective First Day Motions.

25. I have reviewed each of the First Day Motions (including the exhibits attached thereto) listed above, and, to the best of my knowledge, I believe that the facts set forth in the First Day Motions are true and correct. If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Motions.

26. Furthermore, as a result of my personal knowledge, information supplied to me by other members of the Debtor's management, from my review of relevant documents, or upon my opinion based upon my experience, discussions with the Debtor's advisors and knowledge of the Debtor's operations and financial condition, I believe the relief sought in the First Day Motions is necessary for the Debtor to effectuate a smooth transition into chapter 11 bankruptcy, and is in the best interests of the Debtor's creditors, estate, and other stakeholders.

27. Accordingly, for the reasons stated in each of the First Day Motions, I believe that the relief sought in the First Day Motions should be granted by the Court in its entirety, together with such other and further relief for the Debtor as this Court deems just and proper, in the most expeditious manner possible.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Motions be granted, together with such other and further relief as is just and proper.

Dated: June 30, 2017                              Respectfully submitted,

                                                  **TROVERCO, INC.**

                                                   */s/ Joseph E. Trover, Jr.*
                                                  By: Joseph E. Trover, Jr.
                                                  Title: Chief Executive Officer